LAND, J.
Octave Londreau, a colored laborer, on Sunday, July 20, 1913, was killed by one of the defendant’s fast passenger trains.
His widow sued the' railway company for $15,000 damages for the death of her husband, alleging negligence in its servants in not keeping a proper lookout for persons on or near the track, in not sounding a warning, and in not stopping the train in time to avert the accident.
The petition alleged that Octave Londreau on that day seated himself on the end of a cross-tie on the right of way of said company and fell asleep, and while thus asleep, a train of the defendant, called the Memphis Express, going north at a high rate of speed, struck the said Londreau, inflicting a wound in the head which caused his death.
The case was tried before a jury, which found a verdict for $4,000 in favor of the plaintiff.
Prom a judgment, pursuant to the verdict, the defendant appealed to the Supreme Court, which reversed the verdict and judgment, and dismissed the plaintiff’s suit. See Mercier v. Yazoo & M. V. R. R. Co., 138 La. 1043, 71 South. 150.
The present suit was instituted a few months after the first suit, to recover $15,000 damages in behalf of the minor children of Octave Londreau, on the same alleged statement of facts.
The jury rendered a verdict for $1,500 in favor of. the plaintiffs, and from a judgment pursuant to the verdict, the defendant has appealed.
The petition alleges that on Sunday, July 20, 1913, Octave Londreau seated himself on the end of a cross-tie on the main right of way of the defendant company, and while in this position, with his head down on his arms and knees, fell asleep, and while thus asleep was struck on the head, about 3:48 p. m., by a train of said company going north.
On the first appeal, this court said in part:
“It is the duty of courts to reconcile the evidence, if possible, and this can be readily done in the case _ at bar by assuming that the deceased was in such a position that he was not visible to the engineer and fireman on the approaching train.”
“The burden of proof was on the plaintiff to establish the alleged negligence of the defendant, which she failed to do by a preponderance of the evidence.”
The present suit was tried after the rendition of judgment by the Supreme Court in the suit by the widow of the deceased.
By consent of counsel the transcript in that case was to be filed and considered in connection with the record in this case.
Both parties adduced additional evidence.
Mrs. Londreau testified in part that her deceased husband left his house in the afternoon of Sunday, July 20, 1913, to carry some cake and sausage to his mother, who lived at Voisin’s; that he was not drinking or drunk on that occasion; and that she heard of his death about 5 p. m. of the same day.
Londreau, was next seen by the witness Deslonde, sitting on the end of the third cross-tie, south of the Le Brun crossing, in the posture described in the petition.
Deslonde did not recognize the man so sit *647 ting as Londreau, because he could not see his face, but noted that he was wearing a black hat with a widei brim, and that a package was on each of the two ties next to him,
Deslonde saw this man, so sitting on a drizzling day, about 3 or 3:30 p. m.
On the trial of the first suit, the same witness fixed the time at from 1:30 to 2 p. m.
Voisin, a few minutes after the train passed, discovered the dead body of a man right at Le Brun’s crossing, but, without taking a second look, passed on and spread the news.
Later Yoisin returned, and found a number of people gathered at the same spot, and, on looking, recognized the body as that of Londreau, lying down between the two tracks, his head was between two cross-ties, outside of the rails, and was turned north of the body. Voisin further stated that there was a hole in the head of the dead man, but he could not tell on which side, and that the head was between the third and fourth tie from Le Brun’s crossing; that from his house, he could not see where Londreau was sitting on the cross-ties because the spot was hidden by a crop of corn or cane.
Le Brun, the employer of Londreau, testified that the latter sometimes got drunk. This witness saw the dead; body, and the wound, and first stated that he thought that the wound was on the right side of the head, but on cross-examination said he did not know on which side it was.
Miss Lalie Cambre did not testify on the trial of the first suit. The widow Londreau was well acquainted with Miss Cambre, but did not hear that she knew anything about the facts of the case until about a year after the trial of the first suit.
Miss Cambre testified, in substance, as follows:
The witness lived at Reserve station, on the Tibodaux place, and her house was about 2 acres from the railroad.
On the Sunday in question, her sister, Mrs. Denis Ory, was paying her a visit.
In the afternoon of that day, the witness went to take her sister to the station to take the train.
They walked along Andremont’s road to the railroad. On the way the witness saw a negro seated on the cross-tie of the railroad on the lower side of Le Brun’s crossing.
The witness heard defendant’s train blow at the Cornland plantation, not very far from the crossing, and when the train passed it hit the man on the head, and he fell down. The train did not stop.
Mrs. Ory was in a position to see what the witness saw. The man was “exactly” in the position as shown by the photograph marked “P 1”.
Witness knew the man well, but did not recognize him at the time the train struck him, but found out after she got to the station. The man had on a blue and white shirt, which witness had made for Londreau.
After the witness left the depot, she went to the place where the man was struck, and when she got back there they were picking him up to put him in a wagon, and then the witness saw that the man was Octave Londreau.
“Q. Did you tell Mrs. Londreau or anybody that you had seen the accident?
“A. I told my father about it.
“Q. But did you tell Mrs. Londreau about it, or anybody else, at that time?
“A. I didn’t tell her anything about it, but my father told her.
“Q. Do you know when your father told her?
“A. About a year ago.”
(The above testimony was given March 17, 1916.)
While the witness was on the way to the station, Mr. Louis Martin told her that the man killed by the train was Octave Londreau. After her sister left on the train, the witness went back to see the body. The train blew no whistle at all, except the one *649 at Cornland. When she reached the station, Mr. James, the agent, was inside, and sold her sister a ticket. Did not see any chickens around.
“Q. How far could you see Londreau on that day, the way he was sitting on the track?
“A. About 2 arpents.
“Q. I don’t think that you understand my question, if you would walk on the track, keep walking away from Londreau,'how far off could you get and still see him?
“A. Not very far.
“Q. Wasn’t the'day a clear day?
“A. No; the rain was falling.
“Q. Was it raining very hard?
“A. Not very hard.
“Q. Was it falling so hard that you couldn’t see ahead of you for a considerable distance?
“A. No; we could see very well.”
On her cross-examination, Miss Oambre testified substantially as follows:
Her house was north of Le Brun’s crossing. The Andremont road was about an arpent and one-half north of the' same crossing. The railroad station was about 2% arpents) north of the Andremont crossing. The land between said crossing was not planted in anything. When the witness and her sister reached the railroad track the Memphis train had already passed, and had almost reached the station. The train which took her sister was to arrive at “5 something.” The. witness left the station before that train came. She did not téll Mr. James, the station agent, that she had seen a man hurt, because he spoke English and she spoke French; did not tell anybody that she had seen a man hit by the train, because she did not meet anybody; told it at home when she got there; knew that Londreau was dead, but could not state exactly what part of the train hit him.
“Q. Did you scream before the train hit him?
“A. No; but it made a certain impression on me.
“Q. How far were you from the railroad track when you first saw Londreau?
“A. About 2 acres.
“Q. How far from the railroad track is your house?”
The witness could not say exactly, but estimated the distance at “a little more than 2 acres.”
In answer to a question whether the man she saw on the track seemed to be asleep, she answered that he was sitting with his head bent over, and, further, that he did not raise his head or move at all before the train struck him.
“Q. Did you tell anybody that you saw this man killed?
“A. Told my father about it when I got home.”
The witness lived not far from the house occupied by Mrs. Londreau, and had sometimes sewed for her before the death of Londreau.
Mrs. Londreau, on one occasion shortly after the accident, talked to the witness about her husband being killed. “She said that the train had killed her husband and give her great sorrow.” The witness never again talked with Mrs. Londreau on the subject.
“Q. Did Londreau fall away from the track when the train hit him?
“A. Just fell ahead; just dumped over on the side.”
After describing the position of Londreau when struck, the examination proceeded as follows:
“Q. Where was his hat?
“A. On his head; he had a cap.
“Q. Did you see that cap after he was killed?
“A. No.”
Joseph Le Brun, recalled, testified as to the location of his crossing with reference to other places in the vicinity, and among other things stated that the land between. his crossing and the Andremont crossing was cultivated at the time Londreau was killed, either in corn or cane.
The witness stated that the Andremont crossing was about § or 9 acres from the railroad station, and about iy2 acres from the Le Brun crossing; that Miss Lalie Cambre’s home was about 6 arpents from the *651 railroad track; and that the property between the Andremont road and the Le Brun land was the Andremont property, which “has always been in cultivation.”
Peter Mason testified, in substance, as follows:
The witness lived at Oornland, and on the Sunday in question, Yoisin came to his house and told him that the train had killed a. man on the track, whereupon the witness went there and looked at the dead man, and nobody knew who he was; witness “looked at his hat and looked at his shoes and found out it was Octave.”
When witness got there, he did not see the face of the dead man because it was in between the ties. The body was lying in the position indicated by photograph marked “P 3” — that is to say, “bent over, right on the cross-ties” — lying lengthwise down on the cross-ties, with his head between. His hat was between the two tracks. He had a hole in his head about one inch in diameter on his left side, about an inch and a half above the ear, through which his brains were coming out.
Zachary Lasseigne testified to the same effect, except that he located the hole about two inches behind the left ear. This witness testified on the first trial that the wound was “right on the back of the head.”
Dr. S. Montegut, coroner of the parish of St. John, was sworn on behalf of the plaintiff, and the material portions of his testimony may be stated as follows:
The witness held an inquest oyer the body of Londreau, at his house on the Le Brun property, and made a report of the findings of the coroner’s jury, and filed the same with the clerk of the court.
The witness described the apparent injuries sustained by the deceased as follows:
“His head was mashed, the back of the skull was broken, and the right shoulder and arm lacerated, tom off, and the rest of the body was lacerated also ; bruised; abrasions.”
In answer to questions propounded by counsel for plaintiff the witness stated that the wounds could not have been inflicted by a highwayman, but were inflicted by some tremendous force; and the examination proceeded as follows:
“Q. Doctor, if a man sitting in the position as shown by this picture (photograph ‘P T) was struck on the left side of the head by a train going north and his body was thrown on the rail as shown by photograph ‘P 3,’ would the lacerations or bruises to the right side, towards the north, result as you saw them?
“A. Could have resulted that way.
“Q. Prom the body coming in contact with the cross-ties?
“A. Yes.
“Q. That blow in the head, Doctor, you say the rear part of the skull was crushed?
“A. The back part of the head, showing he was struck on the back of his head.
“Q. Could you tell from which direction that blow, which way it was received, from which side it was received?
“A. No, sir.
“Q. Whether it was received from the right to the left or from the left to the right?
“A. I couldn’t say; no, sir.”
The witness further stated that death must have been instantaneous.
On cross-examination, the witness repeated that the blow was in the back of the head, and that he thought that the man must have been seated with his back to the force or object that struck him.
1-Ie further stated that the skull was lacerated and the bones were crushed; that the right shoulder was torn from its socket; the flesh was all tom or lacerated; the forearm where it joins the elbow was lacerated, and the bones of the humerus torn and broken, leaving a great gaping wound.
The witness further stated that he did not think that the tearings and lacerations of the body could have been produced unless it had been dragged; but on the hypothesis that the body had not been dragged, then the force that produced the death was the one that produced the lacerations of the shoulder and arm.
A number of other hypothetical questions were propounded to this witness, who finally *653 answered that the most plausible was that the man was lying down in the grass and raised up just in time to be struck by the fore part of the engine.
The witness was frank enough to concede-that the injuries might have been received in some other way, but persisted in his statements that “the blow must have been in the back of the head,” and that “the man must have been directly in front of that force.”
Mrs. Ory testified that she was busy looking after her children. It was raining, and she carried an umbrella. Before reaching the railroad track, she saw a man sitting on a cross-tie on the side of the track nearest the river; could not describe how the man was sitting, because she was somewhat far off, and- therefore could not tell how he was sitting, except that he was sitting on a cross-tie; could not say exactly where was the man’s head, because she was a little further back than her sister; could not see the man’s face.
On being shown photograph “P 1,” the witness said:
“That is the way he was sitting. He had on a blue shirt, and the rain was falling, and that is the way it seemed to me.”
The witness further stated that the train passed not very long after she saw the man; that they were walking fast to catch the train before the rain fell; that she did not see the train strike the man; that she was about 2 arpents from the track when the train passed. When she got to the track, she saw the body of the man, and then went to the depot.
On cross-examination, this witness stated, among other things, that she could not tell whether the man seated on the cross-tie, was white or colored; that she was not very far from the track when she first saw the man; and the train was not so far away; could not say exactly where the train was; the train had already passed when she reached the track; did not see the train hit the man, and cannot say how far she walked after she saw the man, before the train hit him.
The witness further testified that when she got home she told her husband that she had seen a man killed, but did not know who the man was, until her sister came up to see her and told her.
Mr. James, the railroad station agent at Reserve, as a witness for the defendant, testified, in part, substantially as follows:
On the day Londreau was killed, the land between the Andremont crossing and the Le Brun crossing was covered by a crop of corn and peas, which obstructed the view to such an extent that the witness did not think it possible for any one standing in the Andremont road, about 2 arpents off, to have seen Londreau, if he had been sitting on the cross-ties near Le Brun’s crossing.
“The corn and peas were standing in the field at a height of say 4 to 5 feet from the ground, the pea vines running on stalks.”
At the date of the last trial, sugar cane was growing on the same land.
Miss Oambre was recalled, and stated that she was nearer than 20 feet to the track when she first saw Londreau. It was sprinkling rain at the time. She was positive that she saw Londreau sitting on a cross-tie, and saw the train come along and strike him; saw the train when it hit Londreau in the head. Saw his head after he was dead. There was a crop there, but it was low, and she could see over it. Thought that Londreau had a cap on — it looked like a cap. Was about 2 acres from the track when she first saw the train,
Mr. Rust, the engineer, testified that a few days before the trial of the present suit, when there was no crop on the Andremont land, he walked along the Andremont road some 400 or 500 feet towards the railroad track, while Mr. James sat in the position testified to have been occupied by Londreau, when he was struck by the train. The wit *655 ness testified that from said road James looked like a bump, and he could not swear whether it was a bundle of clothes or a man.
On the whole we do not think that the testimony of Hiss Cambre or of her sister is entitled to serious consideration.
It was sprinkling rain, and the two women, accompanied by children, were hurrying to reach the station before the downpour. Under such conditions it is most improbable that either of them looked to their right over the standing crop of corn and peas, and saw a man seated on the end of a cross-tie beyond the Le Brun crossing.
Miss Cambre did not even observe the crop of corn and peas along the road. On the trial, she first swore that no such crop existed.
She also swore that the man on the cross-tie wore a cap, when as a matter of fact he wore a black hat with a broad brim.
She also swore that the man was struck in the head, a fact which she ascertained afterwards by viewing the body. Mrs. Ory, if she saw anything, saw only the form of a man seated on a cross-tie, yet she did not hesitate to identify a photograph showing exactly the supposed position of Londreau on the cross-tie. That Miss Cambre, was not an eyewitness of the tragedy is suggested by the fact that the gruesome spectacle did not elicit from her an exclamation, or remark to her sister, Mrs. Ory. Miss Cambre testified that she never spoke of the killing of Londreau to any one except her father, and Mrs. Ory testified that she never spoke of the killing to any one except her husband, who she does not deny, sat on the jury in the suit of the Widow Londreau against the defendant.
Mrs. Londreau never heard that Miss Oambre claimed to be a witness until about a year before the trial of the present suit in March, 1916; and Miss Cambre never spoke to her on the subject.
If Miss Cambre and Mrs. Ory were real witnesses in the case, their long concealment of the fact cannot be accounted for on any reasonable hypothesis.
This case, however, is with the defendant on the physical facts disclosed by the coroner in his testimony. The crushing wound in the back of Londreau’s head, and the wounds on his right side, repel plaintiff’s theory that Londreau, when struck, was sitting on the end of a cross-tie, facing the west, and thereby exposing his left side to the train coming from the south.
Mr. Rust, the engineer, an intelligent man of long experience, testified that from actual inspection, measurements, and experiments, which he details at length, he found that none of the projections of the locomotive, which could have reached Londreau, seated as above described, could have struck him on or above his shoulders.
We find in the record no rebuttal of Mr. Rust’s testimony which appears to be reasonable from a common sense standpoint.
Rust, the engineer, Taylor, the fireman, and James, the station agent, as witnesses for the defendant, reiterated the testimony given by them, respectively, on the trial of the first suit.
We may state in conclusion that the evidence in this case is stronger in favor of the defendant on the physical facts than was the evidence in the first suit.
These physical facts are more than sufficient to overcome the dubious testimony of the two sisters.
It is therefore ordered that the verdict and judgment below be set aside, and it is now ordered that plaintiff’s suit be dismissed, with costs in both courts.